# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAYMOND ANTOINE SCOTT, JR.,<br><br>Defendant. | Case No. 3:14-cr-00060-BLW<br><br>MEMORAND DECISION AND ORDER |

Before the Court are the following motions: (1) the Government's Motion in Limine (Dkt. 36); and (2) Defendant Raymond Antoine Scott, Jr.'s Motion in Limine (Dkt. 71). Defendant Scott does not object to the Government's Motion in Limine, so the Court will grant the Government's motion in full. And for the reasons set forth below, the Court will grant Scott's motion in limine in part and deny it in part.

## ANALYSIS

**1. Defendant's Motion in Limine**

   **A.** *Testimony of Natalia Scott*

   Scott argues that the Government should not be allowed to call his wife, Natalia Scott, because she has invoked spousal privilege. On April 21, 2015, the defense sent the

ORDER - 1

Government a statement signed by Natalia Scott, stating that she intends to invoke spousal privilege and should not be called as a witness. Having received this notice, the Government has said they will not call her as a witness. The Court therefore finds this issue to be moot.

### B. *Use of Replicas of Victim's Skull*

Scott objects to the Government using replicas of the victim's skull as demonstrative exhibits. The Government intends to use two different replicas with Dr. Howard, the Medical Examiner and Forensic Pathologist for Spokane County. Scott argues that the type of weapon used and the resultant wound are both irrelevant to this case, and the replicas, even if relevant, are more prejudicial than probative. The Court disagrees.

The first exhibit is a replica of the victim's skull made with a 3D printer. The Government intends to use it for demonstrative purposes only. According to the Government, Dr. Howard, the medical examiner who performed the victim's autopsy, will testify that the placement of the wound on the replica skull is the same as that found on the real skull of the victim, William Reich. He will also testify that the wound on the demonstrative skull is the same as that found on the victim. Dr. Howard intends to use this composite skull to help explain to the jury how the murder weapon pierced the victim's skull and to show the location of the wound. The skull is plastic gray.

The second exhibit is a smaller rectangle plastic or resin cast that measures 2 ¾ inches long by 1 ½ inch tall. This cast is a replica made from the skull piece cut from the victim's skull by Dr. Howard. Dr. Howard intends to use this case to show that the injury

is consistent with a hatchet or axe, and how the hatchet or axe entered the skull. In addition, Dr. Howard will testify that the hatchet or axe left an impression on the skull. All of this would show the type of weapon used. Dr. Howard has indicated that the 3D skull replica and the cast of the piece of bone cut from the victim's skull will assist him in explaining the cause of death, the nature of the injury causing death, and the type of instrument used to cause that injury.

The Court finds that the skull replicas are relevant. The Government must show that Reich was murdered. Proof that his fatal injury was caused by a hatchet or axe helps establish this element. The manner of the victim's murder also could show whether the killing was done with malice aforethought and premeditation.

More specifically, the Government intends to produce a witness who will testify that the victim before his death told the witness that Scott "cheap-shotted him with an axe." The Government also claims that Scott told other witnesses that he used an axe or hatchet to kill the victim. Therefore, Dr. Howard's testimony that the victim's injury is consistent with an axe or hatchet to the head is directly relevant to the Government's theory of the case. And given that Dr. Howard has indicated that the skull replicas will assist him in explaining his testimony to the jury, the skull replicas are also relevant.

The Court further finds that the exhibits are not unduly prejudicial. They are merely models of the skull, and the Court understands that they "do not contain gore and guts but are very clinical." *Gov't Resp.*, p. 5, Dkt. 72.  If anything, such models would seem less inflammatory than actual pictures of the wound. At this juncture, therefore, the Court

finds the demonstrative skull replicas are admissible. The Court, however, will not allow the Government to use the replicas during its opening statement.

## 2. Two Hammers and Axe Head

The Government intends to introduce two hammers and an axe head that were recovered from the crime scene. None of these instruments were the murder weapon. Scott argues that the introduction of any tools or implements that are not the actual murder weapon would be irrelevant and prejudicial. The Government responds that these tools are relevant because they demonstrate that the Government attempted to locate the murder weapon but were unable to do so. The Government claims that the absence of the murder weapon is probative to show homicide and malice aforethought – carrying out a plan to destroy the evidence.

The Court is unclear how the introduction of these tools would be prejudicial. And the Court agrees that the absence of the murder weapon could be a probative of a plan to hide evidence. On the other hand, it seems that a witness could testify to these facts – that these instruments were found at the crime scene and tested for DNA analysis, and it was discovered they were not the actual murder weapon and the murder weapon was not actually found – without introducing the actual objects into evidence. The Court will therefore allow testimony regarding the two hammers and the axe head found at the scene, but will not allow the actual implements to be introduced into evidence.

## C. *Other Acts Evidence*

The Government intends to introduce "other acts" evidence under Federal Rule of 404(b) to show Scott's alleged motive and plan, as well as other evidence that the Government contends is "inextricably intertwined" with the crime charged in the Indictment.

Specifically, the Government intends to show that on the day that the victim, William Reich, sustained his mortal injury, Scott drove over to Reich's resident with his wife and two children and that he spoke to Reich over the course of several hours. Scott on two occasions, according to the United States, told his wife to take their kids, leave, and return later.

The Government further alleges that Scott became angry and aggressive before the murder, and threatened Reich's neighbor while he was mowing the lawn, stating, "You have a problem with me… I will crash your house." The man was allegedly fearful of Scott.

The Government also intends to introduce evidence that another man, named John Van Gelder, was at Reich's home with Scott the day of the murder. Van Gelder will testify that Scott hit him in the chest with a brick after John Van Gelder mentioned Cecilia Lawrence, a woman with whom Scott was having an affair. The Government anticipates that Van Gelder will further testify that he left Reich's residence, fearing Scott.

After Van Gelder left, along with another man, Scott was allegedly alone with Reich. It was during this time that the Government contends that Scott took a hatchet or an axe and struck Reich in the head.

Scott allegedly then left and drove his family home, seeming "very upset." He then drove to another home, where, the Government contends, he got into a fight with a man, pursuing him into the residence, busting out a window and kicking down a door. The Government intends to introduce evidence that Scott told a man named Eric Jackson, who was present at the residence, that he killed Reich. Eric Jackson then told his brother, Tracey Jackson, that Scott said he killed Reich. Apparently Tracey Jackson then sent a text message to Leslie McConville who lived near Reich stating: "Is bear ok? ray Scott was here raising hell saying he killed Bear. Text me back A.S.A.P!"

Scott next drove with his wife and children to another residence, where he allegedly made statements to several witnesses admitting that he killed Reich. The Government intends to introduce evidence that Scott made a statement that he "picked up an axe, I took it to Bear's head." Scott also allegedly stated that he had hit him so hard he could "see the blood and you can see the brains," and that he could only stay for ½ hour, and that he was "looking at a lot of time" for his actions. One witness, Christine Bann, will testify that Scott made the statement, "I picked up an axe, I took it to Bear's [Reich's] head." When listeners doubted Scott's statement, Scott allegedly picked up a rock in a threatening manner and threw the rock at a dog, striking it. Another witness apparently

had such concern that she called 911 and asked that police check to see if Reich was injured.

The police and paramedics arrived at Reich's residence, confirming the injuries. Scott was the main suspect, and the police put a warrant out for his arrest. When the police found Scott, they ordered him to stop, but Scott allegedly fled. Police later located Scott and placed him under arrest.

The Government also seeks to introduce statements Scott made to a man named Arthur Allen in early 2013, prior to the date of Reich's murder. According to the United States, Scott told Allen that he wanted to kill Reich, deliberated on a method to commit the murder, and on one occasion in early 2013, went to Reich's resident with the intent to murder Reich.

The Court agrees that the majority of alleged acts the Government seeks to introduce are "inextricably intertwined" with the charged crime. There are two categories of cases in which other act evidence has been determined to be inextricably intertwined with the charged crime such that the evidence need not meet the requirements of Rule 404(b). *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995). The first category is when other act evidence is "direct evidence, used to flesh out the circumstances surrounding the crime with which the defendant has been charged, thereby allowing the jury to make sense of the testimony in its proper context." *United States v. Ramirez-Jiminez*, 976 F.2d 1321, 1327 (9th Cir. 1992). The second category is when


other act evidence is admitted to offer a coherent and comprehensible story regarding the commission of the crime. *Id.* at 1012-1013.

Specifically, the acts that are inextricably intertwined with the charged crime include Scott's alleged statements to Arthur Allen. This evidence is admissible because premeditation, intent, and identity are elements of Scott's First Degree Murder charge. The Government may therefore introduce this evidence to meet this burden. *See United States v. Begay*, 672 F.3d 1038, 1043, 1048 (9th Circuit 2011) (en banc) (holding that the Government is required to prove premeditation and may do so with any evidence including "planning activity,") (quoting 2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) (2d ed. 2009)).

In addition, Scott's alleged aggressive acts at the location of the murder are also inextricably intertwined with the charged crime. Scott's alleged interactions with the neighbor mowing the lawn and with Van Gelder could be viewed as part of the circumstances of the Government's theory of the crime, and they could help put Scott's visit with Reich in proper context. The elements of First Degree Murder require the Government to prove that Scott committed the crime with malice aforethought, and prove his identity as the murderer. Evidence regarding Scott's state of mind and behavior, just before the murder, is relevant to these elements.

The relevance of some of the events after Scott left Reich's home is less clear. The Government wishes to introduce evidence that immediately after Scott's alleged commission of the crime, he drove to another home fifteen miles away, was angry when

he got there, fought with other males, and chased one male into the home, bashed in a window, broke a door, and admitted to killing Reich. The Court agrees that the Government should be able to introduce evidence that Scott was angry when he reached the residence, he aggressively entered the home, and admitted to killing Reich.

But the Court will reserve ruling on whether to admit evidence that Scott fought with several males when he arrived. The Court will also reserve ruling on admitting Christine Bahn's testimony that Scott threw a rock at a dog, striking it. It is possible that the Court will admit such evidence if it is necessary to provide proper context to the testifying witnesses' testimony, but the Court does not feel it is otherwise directly relevant to the charged crime and could be more prejudicial than probative.

Finally, the Court will allow the Government to introduce evidence that (1) Scott told witnesses that he killed Reich and needed to say goodbye because he only had a half-hour today, (2) Scott said he was "looking at a lot of time," and (3) Scott subsequently fled from the police. A defendant's flight from police may be admissible as evidence of consciousness of guilt, especially when the flight occurred immediately after the crime. *United States v. Dixon*, 201 F.3d 1223, 1232-33 (9th Cir. 2000). The Court, however, will reserve ruling on how to instruct the jury regarding this evidence.

### D. *Prior Bad Act or Criminal Convictions*

Scott requests that the Government refrain from cross-examining witnesses regarding prior bad acts or criminal convictions without leave of the Court. The Government agrees

this is appropriate and has made the same request of the defense. The Court takes no issue with this process. Thus the parties may proceed accordingly.

## ORDER

IT IS ORDERED that:

1. The United States's Motion in Limine (Dkt. 36) is GRANTED.

2. Defendant Raymond Antoine Scott, Jr.'s Motion in Limine (Dkt. 71) is GRANTED in part and DENIED in part.

DATED: April 30, 2015

_____
B. Lynn Winmill
Chief Judge
United States District Court